Good morning, Your Honors. I would like to reserve three minutes for rebuttal. My name is Elizabeth Ann Peterson, and I represent the United States. As this Court is aware, federal statutes have long prohibited unauthorized use of federal lands for livestock grazing. This case began as a routine trespass matter in which the longstanding practice of using federal lands for grazing without permits and to recover past fees and fines for many years of unpermitted grazing. The District Court in this case issued a decision that has essentially rendered federal administration of those lands impossible, finding that only two instances of trespass over a period of decades constituted violations of the federal regulations and awarding damages for $165 in charge. For that reason, we are here today seeking reversal on five substantial issues of law, and we are seeking reassignment of this case to a different judge on remand. The district judge also held two federal employees in contempt of court. That's going to be argued separately. And that will be, yes, that's the subject of a separate appeal, which might. Let me ask you this question. I couldn't figure out, other than completely making it up, where the district judge got this idea that half a mile from a water source had any meaning whatsoever. Is there any evidence or legal theory that you're aware of that the District Court relied on? No. In fact, I believe it's in the transcript that he believed himself that that number was arbitrary. He instead just believed that the behavior of cattle could be reflected by a radius of a half mile from a water source. But in doing so, what he was addressing was the central error in this case, which is the suggestion that there could be private property rights in public rangelands. In this case, the District Court held that it wasn't the kind of grazing right that this Court rejected in Hunter and was instead an easement to get to state law water rights, but you can graze while you're doing it. There is no distinction between those two holdings. This Court's decision in Hunter is directly contrary to the District Court's conclusion that the Hage family has private property rights in federal lands. Congress has never authorized the acquisition of private property rights in federal lands, and the existence of state law water rights has no bearing on whether there is authority to use the federal lands. For that reason, we seek its refusal to apply the statutory and regulatory measure of damages for their past unauthorized use. What specific regulations and statutes does the government contend the Hagues are violating? There are actually two regulatory regimes that govern the federal rangelands. One is the Forest Service statutes, which are the Organic Administration Act of 1899 and the later Grainger-Tye Act that specifies the nature of the permitting system that's in place on those lands, and the other is the Taylor Grazing Act enacted in 1934. That Act has been the subject of considerable litigation in Nevada that is very revealing about the nature of the claims here. There is zero to support the notion that any state law right preempts federal regulation of these lands, and that has been understood in the state of Nevada from long before the Taylor Grazing Act was enacted. The Nevada Supreme Court has decided on multiple occasions that any state law right to use the lands would be superseded by a federal statute that came in to regulate them. And when the Taylor Grazing Act was enacted, it ruled affirmatively that that statute, to the extent that it conflicted with any state law right to use those rangelands, had superseded them. So any belief that a state law right could allow the Hages to continue to use federal lands in violation of federal law is unsupported by any state or federal law. And it's also inconsistent with the U.S. Constitution. But do you agree that Hages have state law water rights in some of these lands? Actually the fact of any state law water rights is irrelevant to this case. We did not challenge the existence of such rights. They brought them in as a defense to the use of federal property. So they have water rights, and it's, as I understand the government's position, that under federal law means they can come in and divert the water, come in on foot or by truck or whatever without cattle attached, to divert that water so that it can be put to use on what they've done. Those are the two ways that one can use water on federal lands. Refresh my memory. Is that the Ditch Act or the Ditch Right Act that they can dig a ditch and get the water out that way? Yes. Well, that's actually the 1866 Mining Act in which Section 9 allows a right-of-way. That's the only property right. To construct ditches and canals. Correct. Let's just go back a little bit because it seems like this all started many years ago when the government denied or didn't allow the original grazing permit. Is that correct? Application for a grazing permit? I would like to answer that in two parts. This case did not start then. This case addresses only trespass on federal lands since 2004. I understand that. But this case has history. It seems like the District Court really was bothered, and I just kind of want to understand what happened, by the fact that the government didn't allow or approve the grazing permit application back in 1978, I think it was. Actually in the 70s when the Hages first acquired their property, they applied for and received permits, and they operated under those permits until the 90s. During the 1980s, the Hages compliance with the terms of their Forest Service permits became extremely problematic. I'm sorry, the what? What became problematic? The Hages were disinclined to comply with many of the terms of their Forest Service permits, and they believed that the United States was treating them unfairly in its efforts to enforce the terms of those permits, and they therefore brought a takings claim saying that by enforcing the terms of those permits against them in the manner that they had, the United States had taken property rights that they had. That ultimately resulted in nothing. The Court of Federal Claims held that one small aspect of that case did constitute a physical taking, but that holding was reversed by the Federal Circuit, and the Federal Circuit also held that the additional access issue that was addressed in those cases was beyond the Court's jurisdiction. So those decisions have been vacated by the Federal Circuit. This Court, however, relied pretty heavily on findings in those decisions and read many of them into the record. It appears to have been extremely concerned that the way that the Court of Federal Claims and the Federal Circuit handled the claims before them was not fair to the Hages, and came to this case with that belief fixed. And in that belief, it also encouraged the Hages to bring a counterclaim against the United States, although it was undisputed that they were using Federal lands and that Mr. Hage did not have and had never applied for a permit. They, the Hages then did bring a counterclaim that was essentially the complaint in their takings case, rearranged as an APA challenge seeking a declaration that they had been deprived of substantive due process. The District Court erred in even asserting jurisdiction over that counterclaim. In the first instance, it found that the decision of the United States to sue the Hages to enforce Federal law was a final agency action subject to review under the APA. And that is clearly incorrect. But even if it had had jurisdiction to consider those claims, all of them were stale. The last action that the Hages alleged to have violated their rights was in 1997, and this claim was filed in 2011. Finally, even assuming neither of those reasons precluded the Court from considering the claims, the claims were entirely unsupported on the record because the Hages eventually dropped their administrative dealings with the government and put all their eggs in their Federal, Court of Federal Claims basket. Let me ask you, you argue in your brief regarding the contempt that a court cannot hold a party in contempt of law? We're going to argue that separately. Oh, I'm sorry. I'm sorry. I'm just buying a different lawyer. Sorry. I'm sorry, Judge. No, no, no. Thank you, Your Honor. I would just like to quickly, before I run out of the time that I would like to use on affirmative, just urge this Court to take seriously the United States' request that this case be reassigned on remand. The District Court, throughout the proceedings from long before the trial ever began, expressed great sympathy with the Hages and expressed strong aversion to the Federal agencies and the programs that they administer on these lands. We recognize that it is extremely unusual for the United States to come here and to request that a case be reassigned to a different Federal judge, but this Federal judge really, truly is biased in this case, and we do not believe that he can put aside the beliefs that caused him to reach the really, truly outrageous conclusions that he did in this case. I'd like to reserve the remand. You may do so. Thank you. Thank you. We'll hear from Mr. Pollitt. I would like to reserve three minutes for a short rebuttal, if that's allowed. No, we're not going to do it that way. Okay, that's fine. You have 15 minutes. Your Honor, it may have pleased the Court. First of all, I want to deal with a question. Would you introduce yourself for the record, please, sir? Yes, my name is Mark Pollitt, an attorney for the estate of E. Wayne Hage. And I would first like to address the first question that was asked before I get into my comments, and the question was about the half-mile limit as the physical scope of the right-of-way that the Court found and we agree exists, and that is there was substantial evidence in terms of testimony and documents as to the normal behavior of livestock around water. And as the District Court itself pointed out, that evidence was uncontested. But that evidence has nothing to do with the need as a matter of law to obtain a great excuse me, may I finish the question? Actually, Your Honor. Sir? I would respectfully disagree. Sir, I haven't asked the question yet. Okay, sorry. The legal question is whether cattle may be grazed anywhere, including within half a mile of the water source, without a grazing permit. There's no question that with a grazing permit, the cattle can graze near the water or far from the water, wherever the grazing permit allows. What statute or regulation allows grazing without a permit in this area? Here, Your Honor, is where the United States, I think, has kind of confused the issue. The issue is not whether there is a generalized grazing right. The issue is, A, whether the And secondly, as an incident of that right, whether the livestock has the right to consume forage while it is in the use of that easement to and from and around the water right. Didn't Hunter answer that question against your position? No, Your Honor, I would respectfully submit that it does not. In fact, Hunter itself specifically pointed out that the law must allow for a right-of-way to and from the water, and, in fact, in the Colvin case, under which the government ruled. Where in Hunter does it say that? Give me the specific. It's specific. I don't have the case in front of me. I'd like the actual cite. I have the citations for that, Your Honor, with specific junk citations. I'd like it now. Okay, Your Honor. Because it seems that what we said in Hunter is that water rights do not create an easement to graze on public lands. That is correct, Your Honor. It did say that. Okay. It also said that there was a right-of-way to and from and around the water. But a right-of-way, if you can't graze, the right-of-way is the right-of-way of human beings to come and divert the water. The diversion of water and the stock water rights, first of all, Your Honor, according to the Act of 1866 and all the cases we cite pertaining to the Act of 1866, say that contrary to what the United States argues, that state law governs in terms of water rights and those easements pertaining to water rights. Now, the government argues the 1866 Act provides only for rights-of-ways for ditches, but that's not correct. And canals. I'm sorry? And canals. Ditches and canals, but that's not correct. The portion of the Act of 1866 that became known as RS-2477 provides for public highway rights-of-way. And under the law of Nevada, including decisions, for example, 9,947.71 acres, the United States versus out there, applied the law of the state to determine, you know, what constitutes an RS-2477 right-of-way. And they concluded, as does the state law, including the state Supreme Court in a case called Steptoe out there, that it is a public right-of-way when the right-of-way can be created by the use of even one person, and that public right-of-way serves a public purpose such as mining, which under the laws of Nevada is considered a public purpose. So too are grazing and any other beneficial use of water. The 9,747 acre-plus case involved a mining claim in which first the right-of-way was created by the individual who did his assessment work. Then that was later used for employees to go back and forth to the mine and used to take ore from the mine to the railhead and then eventually even used as a private toll road. Under Nevada law, that is considered a public highway, and under the Act of 1866, as the 9,000-plus acre case found, that then qualified as an RS-2477 right-of-way. I'm going to ask you a question about the Taylor Grazing Act. The Taylor Grazing Act specifies that there is a preference in obtaining a grazing permit for a person who has water rights. Why would that provision even make sense if there could be grazing without a permit anywhere, including near the water rights? Well, Your Honor, actually Judge Jones found that a permit could be required even within the bounds of the right-of-way. This case in the United States could have been...  Well, Your Honor... Because the statute says a person who has water rights has a preference to receive a grazing permit. Correct. That appears to me to presuppose that Congress understood that even people with water rights have to get a grazing permit. Do you disagree with that reading of the statute? And if so, why? Respectfully, Your Honor, I do. Why? Because among other things, it also contains savings provisions that pertain to rights acquired prior to the enactment of the Taylor Grazing Act, which, Your Honor, frankly... And your client had rights before, whenever that was, 1934, whenever the Taylor Grazing... These rights go back all the way to the 1800s, Your Honor. They were well before the Taylor Grazing Act and recognized by the Act of 1866, which the Supreme Court itself has said in many cases recognized preexisting rights which must be protected by the federal government. But the reason, Your Honor, I would suggest that the United States' case is kind of off target on this is because they chose not to sue on some other legal theory. They sought to sue on a theory of trespass, trespass to land by having the livestock... The theory is amply demonstrated by the production of maps where it shows a line here showing this land and it says BLM. And another line over here and it says Toyabe Humboldt National Forest. And they say, there's livestock inside these boundaries, therefore it's trespass. Well, one defense to trespass, of course, is... And this is important. The United States challenged the court's application of state law as to damages. What they did not challenge was the court's application of the decisional law of the state, which the Supreme Court says applies if there's no other provision of law that says otherwise, to determine whether there was trespass in the first instance. In other words, if there's no trespass under Nevada state law, there's no trespass in the federal land. The Supreme Court has been clear it doesn't matter whether the United States is the party. But secondly, it has always been a defense to trespass. If you are on your right-of-way and within the bounds of your right-of-way, your physical and legal scope of the right-of-way, the utilization of the forage is an incident of that because it literally cannot be prevented. I don't understand how your argument is in accordance with this court's decisions in United States v. West and McFarland v. Hempthorne, which deal with the plenary authority of the federal government on the use of federal lands and the occupation of federal lands under the Property Clause of the Constitution. How is your position consistent with those cases? Your Honor, every case I have ever found, including from this circuit, recognizes that there is a right of access to and from the water and around the water necessary for the beneficial use of the water. Yes, but access does not equal grazing under Hunter. Your Honor, I respectfully submit this is not a grazing case. This is an access to water and the incidental use of the forage. Well, if it's not a grazing case, why are there cattle? I'm sorry? If it's not a grazing case, why bring the cattle? I mean, if you didn't, if Mr. Hayes or others with his assistance hauled the water out in a truck or built a ditch, we wouldn't be here. Why isn't that about grazing? Because in Nevada, Your Honor, according to Nevada state law, which governs the nature of the water right, the way in almost all cases in which the water is diverted for use is by having the cow at the water. Counsel, that's why I was asking about the West case and the McFarland case, because they deal with the land. It's not about the water rights. He has the water rights, but that doesn't mean he can come onto the Federal land without obeying Federal law, at least according to our Court's previous cases. And Your Honor, we submit that he did not, because the issue here is not grazing, but the incidental use of forage within the bounds of the right-of-way while he's in the lawful use of that right-of-way. The Fed Circuit itself, in the Hayes case, when the government raised the argument that they did not have the right to access that water without the permission of the Federal government, rejected that argument. And I submit that Hunter rejected that argument, too. Hunter spoke about a generalized grazing right anywhere and then said, and I'm trying to find the site you asked me to give you, Your Honor, because I knew Hunter would be argued here at some length. Hunter U.S. 388 at Fed Second 148 at 153 to 154 and said that they had to be allowed to access their water and gave the Hunter leave to go ahead and allege, to amend the complaint to allege, the right-of-way. They did not say there was no right-of-way. They suggested there had to be a right-of-way and it had to be according to one of the methods contemplated by the 1866 Act. Well, there are two ways. One is by diverting the water from a flume or a ditch to some other place. The other, which is what Steptoe found to be the only feasible and economical method in Nevada and had been the custom for over 40 years before the Steptoe case itself was decided, to divert the water and put it to beneficial use because Nevada is not a semi-arid state, it is an arid state. And the only reasonable way to do this, those rights, state and local law and custom, were embodied as federal law in the 1866 Act. So if you have, I just want to make sure I understand, so if you have water rights, Yes, ma'am. then you get an easement. Is that right? They consume, this is where the distinction, and Judge Jones was very careful to draw the distinction between grazing and the utilization of forage on the way to and from and around the water. Okay, but can you explain to me what is the distinction between those two? I'm sorry, Your Honor, I couldn't hear. What is the logical distinction between grazing and using forage? All the cases, including Hunter, that talk about grazing are literally talking about a free-roaming right to graze anywhere on the allotment. And this also, by the way, was a finding which was not contested on appeal by Judge Smith in the taking case. And I don't need to go into it now, but the description of the taking case nature and its history was not accurate, Your Honor. He found also, literally as a matter of common sense, but also consistent with the principles of law, that when Congress acts, it is presumed to know all the facts relevant to its legislation. And there was plenty of testimony at trial showing the truth of this matter, that no more than you can control where a cow drinks can you control when a cow is going to put his head down and chomp on the forage. All the more reason to consider it grazing. Your Honor, the issue here was not a defense to whether or not a permit was required for some kind of grazing. The United States could have chosen that. They didn't. They chose to argue trespass. And having a right-of-way, the being on the land, having a right-of-way is a defense to trespass so long as you're within the legal and physical bounds. So I wanted to make sure I understood your argument then. So if you have water rights, then you have an easement, which gives you a right-of-way. And if you have the right-of-way, then you can have your cattle grazed. May I give you an analogy, Your Honor? Well, no. If you could just follow me, because it seems like I'm trying to figure out what happened here. And if this is the way, in your view, the law works, then you have the ability to have your cattle grazed or foraged, whatever you want to call it, within a half mile of whatever easement that is. Is that your view? It is my view. Again, let me give you the analogy. If I have a right-of-way across your property to get to my property on the dirt road, no matter what I do, I'm going to kick up some amount of dust. The easement that allows me to do that is very unlikely to say, and by the way, while you're using the easement, you can kick up dust. Because you will. It's inevitable. But the other thing, though, is I'm not sure that if you have a right-of-way, an easement says you can bring all of your cattle as you come across it within a half mile on each side of that right-of-way. That's what I'm struggling with. Because I don't think that's what it envisions. I don't think it envisions all of your cattle following you all the way to the ditch or to the water. Well, they don't follow, frankly. No, I understand that. But using your example, it would mean you get to kick up dust. Does it mean also you get to bring a thousand cattle along that way? If that's what the easement was for. The easement is actually governed by the water right and the extent. There's a time of place, manner of place, and use under the state law. So I can use that. If I have a stock water right and that's all I have, that's what I get to use it for. And if it's for 400 head, it's for 400 head. And this is where I go back to the idea that Congress is presumed to know the facts underlying its legislation. Congress has to be presumed to know that livestock on the way to and from water and around water is going to eat. The half a mile distance was based on evidence on the cattle behavior that would have been available to people legislating. And Judge Jones drew a balance between what he felt was quite possible, five miles, because livestock will do that. But it's like a bell curve. Some of them are going to be out here. Most of them are going to cluster here. And when they're around the water, there gets a point where if enough cattle are moving farther away from that water than what that bell curve suggests, why then the inference would change from you're just using your water right and this is an incidental use of that. Thank you, Counsel. You have exceeded your time and we appreciate your argument. Thank you. Thank you, Your Honor. The government, I believe, has some rebuttal time remaining. Your Honors, even if it were possible to string together the various state law propositions that my friend ---- Can you speak into the microphone? I apologize. Is that better? Stringing together the state law rights that my friend just mentioned does not get you a right to use federal land. More than 100 years ago, the Supreme Court held that stock grazing on forest lands did not result in a private property right that would persist. It could be revoked at any time. It was an implied license. And there is nothing in the 1866 Mining Act that gives a right to use land beyond the ditches and canals that are granted for water. No other right to use land in conjunction with water rights is granted in that statute. So there really is no way to get from the Mining Act or any other federal statute to an easement over federal lands to use state law water rights. And as far as the Steptoe case is concerned, actually Nevada law holds that the use of forage and the use of water are inextricably linked in stock watering. And therefore, Mr. Pollitt is correct that that is the manner in which a state law stock watering right could be appropriated after 1957 when that case was decided. But before that, there wasn't any record that the state recognized stock watering on federal lands as a beneficial use until 1927. So these rights that the Hages claim from prior to the 1866 Mining Act are themselves somewhat questionable. We have not challenged them here. But if they provide the basis for a right to use federal lands, their existence before the Mining Act was enacted is very questionable under state laws, I think our brief made clear. In closing, I would just like to say that we believe that this case is extremely important, that the protection and administration of these federal lands is a critical responsibility of the federal government and that the decision in this case has made that all but impossible and has encouraged people who choose, the very small handful of people who choose to defy the law in this area to do so. We strongly urge the court to reverse on all five of the substantive issues that we've raised and we request that the case be reassigned to a different judge on remand. Thank you very much. Thank you, counsel. The case just argued is submitted and we appreciate very much the arguments of both counsel. We'll now hear the, I'm not sure if it's really a companion case, but the Page, and I apologize for mispronouncing the name earlier, and we'll hear from Ms. Wang. Good morning, Your Honors, and may it please the Court. Vivian Wang on behalf of Tom Seeley, Stephen Williams, and the United States. I seek to reserve three minutes for rebuttal. Mr. Seeley and Mr. Williams were found in contempt for doing nothing more and nothing less than their routine duties as federal land management officers. Their actions were required by agency regulations and they were not in violation of any court order because no court order was in place. The district court violated established legal principles when it imposed contempt sanctions against them and against their agencies, and these determinations must be vacated. I wish to focus my remarks this morning first on one of the main errors of law by the district judge, which is the finding of contempt in the absence of a decree that required or prohibited any conduct. The central component of a contempt proceeding is the violation of a definite and specific court order. And here, no injunction was in place, let alone a clear one. Sotomayor, what happens when a party is disrupting a court proceeding? Can't a judge find somebody in contempt? Yes, Your Honor. The laws do provide for, for example, contemptuous conduct, for example, the presence of a judge so as to disrupt the court's authority. And so the distinction is that it happened in the presence of the court? That is one distinction, Your Honor, is that the other. Is there any other distinction? Certainly, Your Honor. So if someone were disrupting court proceedings during a trial, for example, as Your Honor mentioned, that could be a basis for contempt. Another basis for contempt and one that both this Court and the Supreme Court have is a preliminary injunction or a temporary restraining order or maybe in violation of a consent decree, some specific written set of instructions that either prohibit or require certain conduct. And so if a party violates a specific definite order in that context, that could also be a valid basis for contempt. Well, counsel, I think the theory was that somehow these individuals were interfering with the subject matter of the lawsuit. For example, if there were a court case involving the ownership of a valuable piano and somebody went out and smashed it to pieces, that might be contemptuous even if there was no court order. But just as a matter of sort of understanding the theory of the district court or what happened here, did any of the actions of either Mr. Seeley or Mr. Williams relate specifically to the Hage's cattle and the specific sources of water that are at issue in the main case? The answer to that, Your Honor, is both yes and no. So to answer Your Honor's question, did any of the actions of Mr. Seeley and Mr. Williams relate to the cattle bearing Hage or the estate's brands? The answer to that is no. Well, that was my impression as well. So if somebody else's cattle are running on this land, then presumably they're the ones who are trespassing. So why does that even have any relationship to the main case here? Absolutely, Your Honor. We agree with your understanding that that is the way the law operates. Your Honor began this line of questioning by referring to the heart, I think, of the case, which is its mistaken belief that the mere existence of litigation over Hage's grazing functioned as an automatic injunction against enforcement of Federal laws concerning the lands at issue against nonparties. And this relates back to Your Honor's point, which is that that's right. For example, the grounds that the district court cited for contempt, including the sending of trespass notices to nonparties, these were not actions directed toward Hage. They were not actions directed toward the estate. And because there was no order in place, for example, if the party— I understood that there was a particular witness, Berg, whose cattle had been transferred to Hage, and he was issued a notice by Seeley and the other government person and or, and that that interfered with the trial. I respectfully, Your Honor, would disagree with the character— Not what he was saying? I'm sorry. I missed the last part of Your Honor's question. I'm just trying to understand what the district court judge thought interfered with his trial. And wasn't it interference? Didn't he think that when Berg was given a notice that he was in violation, and he was testifying at trial, and it was he had transferred his cattle to Hage, and so that's what the district court thought was the interference. Yes, Your Honor. So during the course of the trespass proceedings, when Mr. Berg was testifying, the line of questioning was about how he was running his cattle on these Federal lands and without having any permits. And so in that line of questioning, the district court interjected his belief that the routine sending of trespass notices were, I believe he called it an abomination. These were ordinary trespass notices that were sent. They are required by the regulations. That's the part I'm looking at. Yes. They did send notice of violations to Berg while he was a witness in this trial. No, Your Honor. It was not while he was a witness. I believe that they were the original. So the ‑‑ I guess to explain this, the process that the agencies go through when they detect unauthorized ‑‑ That's my question. Berg was ‑‑ this trial was ongoing. Berg was a witness, and he got a notice that his cattle weren't trespassed. Is that correct? Yes, Your Honor. He did receive a notice that his cattle weren't trespassed. And later that notice, I believe it came out in the testimony, that the notice was rescinded because at the time the agencies had not been aware that Berg had ‑‑ was purporting to operate under a lease arrangement, which would have been invalid anyways because Mr. Hage, who Berg was presumably running cattle under, did not have the permits. But yes, Your Honor. That is one of the basis of the district court's findings, is that he believed that these routine acts, which were directed at nonparties and which had not been enjoined by any court order, somehow interfered with the conduct of the trespass claims. And I think to this point, Your Honor, it's also important to note that the complaint filed by the United States in this action were directed only toward Hage and the estate's cattle. They were not directed toward water rights. I guess I can ‑‑ I mean, I can understand why the district court judge might have thought it was interfering with his trial if the notice went to the witness in this trial. Well ‑‑ I mean, I think, isn't that what his thinking was? That ‑‑ it does seem from the transcript, and the court does not lay out its reasoning in any sort of separate written order for us to pick apart. But yes, Your Honor, I believe that the court did have this belief that the pending litigation operated as some sort of injunction against any land management actions. But that is not how the law operates, and that is certainly not how the court's jurisdiction should be interpreted. And as we discussed in our briefing, the district judge's assertion that any sort of litigation over Federal lands at issue would somehow automatically sustain or suspend those regulations, that has no basis in law. That's the broadest reading of what he did. The narrowest reading of what he did was he thought the notice going to a witness in this case interfered. Yes, Your Honor. He did believe that, but that is not how ‑‑ that is not what was going on. There is no evidence that there was any intent to interfere or any intent to intimidate, for instance, Your Honor. And if the Court permits, I wish to reserve the balance of my time. You may do that. Thank you. Your Honor, the first thing I'd like to note is that what the United States focuses on the trespass claim that it bought, there was a counterclaim in this lawsuit in which the conduct of the United States generally was at issue pertaining to water rights, to permits, to the conduct of the United States, which in the Hage trespass case, excuse me, the Hage taking case, that judge found that many of the actions of the government were motivated by hostility toward the Hages, a conclusion that was not challenged on appeal. This case also addressed some of these issues, but in any event, it was the United States itself who invoked the jurisdiction of the trial court and asked that these issues be determined. Now, there was a statement for a question that the court had asked about interference with water rights, and the name of Danny Berg has been mentioned, but what has not been mentioned is the name of a man named Gary Snow and his correspondence and work with the alleged contender, Mr. Seeley, pertaining to the Ralston allotment. And at trial on pages such as the supplemental excerpts of records 353, Exhibit 48, Exhibit 1594, 95, and so on, 1650, 1662, there is evidence that they not only allowed Mr. Snow on there, although they did say, now you have to haul water, but knew very well that it was an impossibility to keep Mr. Snow from using Mr. Hage's water. And the record also shows that one Forest Service, I believe it was Forest Service witness, when asked whether it thought it was okay for the Forest Service to allow other people to use water rights belonging to a third party, had answered yes originally until the judge pressed the question a bit further. Counsel, can I ask you a sort of general overview question, and that is this. I want you to assume for the sake of this question, although I know you vigorously disputed, I want you to assume for the sake of this question that the United States prevails in the main case and that your theory is not accepted by the court. What, if any, effect would that have on the contempt piece of the case? Truth be told, Your Honor, none. The decision on the merits of the case doesn't apply because the whole concept of contempt, and in this case it's civil contempt, so intent is essentially irrelevant for this case. And if it were relevant, that would be a factual matter to determine. Well, let me ask you, and the reason I say that is this. Because as I understand your theory, the main case is at least in part about water rights, but the government's position is that it is not at all about water rights, which are assumed to be valid. It is only about grazing. So if the case isn't about water rights, then how could the district court be correct that there's been an interference with water rights that are not the subject of the lawsuit? Well, Your Honor, they say they accept the water rights, but they don't accept the water rights. They challenge what those water rights contain and what those water rights allow the ages to do or to not do. That doesn't answer my question, though, because the theory of the district court, as I understood it, in the contempt was at least largely about water and not about grazing. And so if we were to conclude, counter to your argument, that water rights really have nothing to do with this, it's only about grazing, then how could actions about the water even pertain to the case? I guess that's my problem. Your Honor, I would again have to respectfully disagree. The case was about trespass and whether the cattle had a right to be where they were. And if they had a right of way, our theory of the case was no, they did not. Right. But it wasn't just a trespass case. It was a counterclaim. And the counterclaim was interference with water rights, interference with other things, making decisions. For example, one of the decisions that the judge found to be intolerable was because Mr. Hage, the elder Mr. Hage, before he died, the government claims he relinquished, as he did not. He signed a permit asking for, you know, for an extension of his term permit, the first one had expired. And underneath it, he simply wrote subject to UCC 2-207, meaning just because he signed the permit, he was not waiving any claims that he might have in the claims court action, which was already pending. So this case was about more than water rights, but the water rights were a part of it. We asked the court, in fact, to declare those water rights and whatever easements and other things that might go with it. So you can't accept the premise that Judge Grady made? Your Honor, I can't accept the premise because he was — Okay. All right. How were Seeley and Williams on notice that they were supposed to suspend all law enforcement proceedings on the land? Well, first of all, Your Honor — Let her finish the question, please. Yes, ma'am. On the land, an issue in this case. How were they supposed to know? Well, it was not that they — the judge expected them. In fact, he's very clear in his decision that he didn't expect them to suspend all things. Trespass notices alone were not the issue. And the court, by the way, just — That makes it even more confusing. I mean, what were — how were — how were they supposed to read the judge's mind or to know what it is that they were or are not allowed to do based on what's in the record here? They submitted this to the court to determine these legal issues, and then proceeded to do so. They came to Federal court. And then they came to the court, they submitted it, and I suggest that when you submit an issue to the court, you submit to anything that may be raised in response. And what's your authority? What's your authority for that? The fact that we're even allowed to bring the counterclaim in the first instance, Your Honor. You can — I — just as a matter of common sense, if you bring a case to the court, you're opening yourself up to defenses and rebuttals and counterclaims. Should you just presume — why have preliminary — or injunctions at all? I mean, why, you know, have any reason to have — Your Honor, if someone wanted a preliminary injunction, it should have been the United States. Except, counsel, the government came in and said, person number one is trespassing, and we'd like to be compensated for their trespass. And your theory is, well, not only was person number one not trespassing, but they aren't allowed now to claim that people number two, three, four, and five are also trespassing, because they've alleged that number one is trespassing. Now they have to stop saying anybody's trespassing. Well, one of the questions that they put before the Court, Your Honor, was who is their trespass and who is liable for the trespass. Now, the government was saying — But — but I'm trying to understand the logic of that. If they argue that person number one is trespassing, how are they supposed to know, and why would they stop claiming that other people who are acting similarly also are trespassing? Isn't that a natural thing for them to do? Your Honor, well, the complaint, first of all, names all of those livestock, including livestock Mr. Hayes was leasing from third parties as trespassing and arguing that he was liable for them, while at the same time pursuing alternative challenges on their own. And the United States talked about notices of trespass. That's not what was complained about. Danny Berg and others received demands for payment and were — were — while they were in the testifying or briefing. Sure, because they were trespassing. That was the theory. But the government's actions were all consistent. Well, they asked the court, Your Honor, to decide — they asked the district court to decide whether there was trespass, who was liable for that trespass, and what the damages were. But, counsel, I still have trouble with the logic of that. Let's say a whole bunch of people come onto my front lawn and I sue person number one for trespass. Now, am I supposed to know that I'm now forbidden from going after the rest of the people who are also camped out on my front lawn because there might possibly — I might lose on person number one? That seems to be the theory that the court adopted. Well, Your Honor, the United States knew, and although they say they didn't know, they knew, and it's in the record in detail, that Mr. Hage had the sole responsibility and control over that livestock. They sent demands for payment trying to get money from the same people that they were trying to get from Mr. Hage. If they really felt they were liable in trespass, they could have made them parties to this lawsuit. In fact, they did. They missed Mr. Colvin, a party to the lawsuit, and they separately settled with Mr. Colvin. Your Honor, I really think that the legal theory here, the issue here, is whether the United States, having submitted matters to the court, now gets to pursue parallel remedies on its own in a way that essentially interferes with the court's own administration of justice. There is a case we cited in our brief. It was an appellate court case, a federal district court — or, excuse me, a federal appellate court case involving a school, a civil rights case, in which the subject matter of the suit was whether or not the school was discriminatory in handing out scholarship awards. There was an injunction. The injunction expired. The district court refused to extend it. It went up to the Court of Appeals. The Court of Appeals actually called the school and asked them if they would mind stipulating to not distributing that money. It was a request. The school denied the request, called a special meeting, had its attorney there and said, there's no injunction here. Could we just go ahead and disperse this money before the Court of Appeals gets to hear the case? The attorney said, oh, there's no problem there. They went ahead and did it. And the court found them in contempt for essentially having placed the matter in front of the court, accepting the court's jurisdiction to decide all the issues connected to the lawsuit, and then, you know, thwarted that by giving the money away before the court could gain any control over it. I submit that that is what happened here. Thank you, counsel. Thank you, Your Honor. Ms. Wang, you have some rebuttal time remaining, about a minute and a half, I think. Thank you. I have a brief follow-up to the question that Judge Wardlaw asked earlier regarding Mr. Berg and the judge's basis for finding that contempt. I checked the record, and indeed the trespass notice sent to Mr. Berg was actually sent before trial. And it was actually resolved and rescinded before he was a witness at trial. So that is also clearly not an appropriate basis in the record for the lower court's finding of contempt. And to briefly address my opponent's discussion of the temporary 1-year permit that had been issued to Mr. Snow, that is likewise not an appropriate basis for contempt, first because, as we've discussed previously, water rights issues were not raised by the United States in the complaint. And secondly, because those — even if the water rights had been at issue, the permit required Mr. Snow to haul his own water. And indeed, after the first renewal of that permit, Mr. Seeley ceased that authorization to Mr. Snow. So neither of these — there is indeed no basis in the record for any finding of contempt here. And the lower court's rationale, Your Honors, has placed the agencies in an untenable position. Each time a Federal land management action is challenged in court, the agencies have a hard choice between either suspending the administration of grazing programs, which would invite lawsuits alleging failure to enforce regulations, or, on the other hand, to continue managing Federal lands and face the specter of a contempt citation. Mr. Seeley and Mr. Williams have each dedicated more than 35 years to public service, and the sanctions imposed on them and on the agencies are unlawful, and we urge this court to reverse and vacate. Thank you. Thank you, Counsel. The case just argued is submitted, and we appreciate the arguments very much from both counsel. And with my colleague's permission, we'll take about a five-minute recess before hearing the remainder of the calendar.
judges: Wardlaw, Graber, Murguia